Good morning, Your Honors. I'm Gary Finn. I represent Melchor Guevara. And I didn't know either that these three cases were going to be- I'm sorry. We usually try to notify counsel. Yeah, you usually do, but that's okay. It's been very interesting- You're supposed to notify us of related cases, so- That's true, but I didn't know that. There's so many of them. Yeah, right. Not your fault. Well, now you've heard everything that's gone on. What do we have to add here? Well, I guess what I'll try to do, Your Honor, is I'll take a stab at answering some of the questions that were raised in previous cases. And I want you to, first of all, your case, how does it change from Cobian? Well, I'm not- Isn't it the same? It's very similar, yes. I think it's- I mean, I wasn't familiar with the facts in those previous cases, except for what I've heard today, but I do believe the facts are similar. But I think- No, there's no I-130 in this case. Well, no, in my case, my client had filed for adjustment. He had filed his I-485. He did that seven years prior to getting in trouble for the alien smuggling episode. And I think, to go back to a question that Judge Fisher asked earlier about why the seven years, why did Congress put in the requirement of seven years of continuous residence in the United States, I think that goes back to the predecessor statute, which was 212C, which was repealed in 96. And I think the point about that is that what's important, and what was important under prior law, is a lawful domicile and a legal intent to remain in the country for seven years. And I think that's what Congress wanted to see. It wanted to see a person, even if they didn't have seven years as a lawful permanent resident. They had seven years, just like the predecessor statute, seven years of lawful- In the prior statute, it was called lawful domicile. Now it's called lawful residence, right? And I think in my case, and in all the cases, there's seven years of lawful presence because my client, and I believe the other petitioners as well, were in the country lawfully when the adjustment of status was filed. And by the way, the adjustment, the work permit is only approved if there's a prima facie showing of eligibility. Those adjustment applications are reviewed when they're filed, and the work permit is issued when there's a prima facie case. The permanent residence isn't granted until after an interview. The point of having the work permit is so the applicant can be in the United States legally, can work with permission, can travel outside of the country and return. And I think that's also very important because, you know, a person has to have some status to return to. If a person is given permission to travel outside of the country, as they are as a family unity beneficiary, also the adjustment of status applicant can travel outside of the country and return. You return, you resume the same status or the same legal situation that you were in before you left. I mean, to me it's obvious a person must have some status in the United States if they can travel outside and return and resume the same status that they were in before they left. But doesn't our 1999 case in San Pablo versus the INS really take a cut at your argument? The employment authorization, under that case, the employment authorization is routinely granted to aliens who file non-frivolous applications of relief. Such a grant is not part of a larger determination by the agency. That's what San Pablo says. And it would be unreasonable for employment authorization to erase all the violations of an immigrant's status. So how do I accord just simply the authorization of the employment any kind of status after San Pablo? Well, I think that the language of the statute that we're dealing with here is extremely broad. And, you know, the government likes to say that we have to look at the plain language. If you look at the plain language of the cancellation of removal statute, it says that a person is lawfully present if they're admitted in any status. Any status, that's extremely broad. I think that if a person is granted a work authorization in conjunction with their application to adjust status, then they are here legally as an adjustment of status applicant. I'm not sure, Your Honor, if that answers the question. I'm not terribly familiar with the case that you referenced. But at least, you know, here, since the Garcia Quintero decision, which, as previous counsels have pointed out, really goes through an analysis of the Board of Immigration Appeals decisions where, you know, they've said that a nonimmigrant, like the person that came across for 72 hours, the nonimmigrant who comes across just for a visit has no legal right to intend to remain indefinitely in the United States. A person in that situation is deemed to be residing lawfully in the United States for purposes of cancellation of removal. Why shouldn't a person like our clients who have filed their adjustment applications, they have a work permit, with advanced permission they can travel outside the country and come back, and they can lawfully intend to remain here? I think that's the key. That's one of the keys. The cancellation of removal statute, as you know, is remedial. It's designed to let people who have put down roots in the United States, if they make a mistake, if a judge looks at their case and says they should be given another chance, they have that opportunity. I'll reserve the remainder of my time and let the government attorney come up and answer some questions. Thank you. Good morning, Your Honors. Nice to see you again. May it please the Court. Mary Simonian on behalf of the government. I don't want to exhaust the issue. It's been heard. But there was a few points that I didn't hear, actually. And specifically, I wanted to, it got muddled a little bit, the timeline in our case. So I want to just clarify that. Did you point out all the places where you disagree with your colleague from the Department of Justice? I actually agree with all she said. She did a very good job. I didn't mean to suggest it. In our case, a petitioner applied for adjustment of status. The date is a little unclear, but it's either November 96 or November 97. He applied for adjustment of status and got an EAD January 8, 1998. And that's the date the IJ really relied on. However, his status wasn't approved until the 2000 of October. And then the NTA was issued in 2006. So from 2000 to 2006, he didn't have the requisite seven years. He, of course, wants us to date back to the date that he got the work authorization. One case that I think is a little bit more direct on point, and I'm not sure if I heard this case, was a Tenth Circuit case, Ochoa-Colchado, which I believe is cited in my brief, but I'll give it to you again. It's 521 F3B 1292. I understand it's not binding on this court. However, it is instructive. Where that was an adjustment application, and it was a coupling of an EAD. And there the court said, an alien who has filed for adjustment and received a work authorization may in some sense be authorized to be in the United States, inasmuch as it is granted a temporary reprieve from removal and permitted to work here pending the outcome of this case. But there is a distinction to be drawn between tolerating an alien's presence for a limited purpose and legalizing an alien's presence. I think that's the heart of the issue here. And to demonstrate that even more, I did a little side-by-side to maybe instruct the court of the FUP and the EAD. So the FUP is a congressionally mandated statute. Congress intended to create it as mandatory protection. The EAD doesn't have that. The FUP, you're allowed to remain in the United States for two years, but its focus is on staying, as Garcia-Quintero said. The EAD does not do that. It's tolerating. It's giving you an opportunity to care for yourself by allowing you to work here while you're here in the United States, pending your application. The FUP allows you to leave the United States as an FUP and come back. That's not the same situation here. I mean, the greatest you get to is, as my petitioner points out in his brief, is you have a pending application when you come back. That's still not, you know, what you need to get the requisite seven years. What about the person who's overstayed the visa and wanted to then go back outside and get advanced parole? Right. Well, as my colleague pointed out, and this Court has agreed with, there's two ways that it's considered admitted in any status, and that's either being physically inspected, which that individual would have. I'm asking, what about the person who has come in as a non-immigrant visa, overstays, and then wants to get advanced parole? Can that person do that? They want to leave. Would they be able to do, as you said, as suggested? If they overstayed their visa, the advanced parole is a separate application. I know. So I've overstayed my visa. Now, I would like to go out, just like the non-immigrants. I believe overstays would be issued an NTA for overstaying. Yeah, right. They wouldn't be able to go out and come back in. Right. So they would be quite qualitatively disadvantaged as opposed to Ms. Cobian or Mr. Guevara, right? I see where your point is getting at. However, I think it's really the work authorization we're focusing on. I think that adjustment application, this Court has agreed with. But you were talking about advanced parole. You were making the distinction between family unity program and the non-family unity. But the individual wouldn't. You won't be able to answer my question if you don't let me finish. I'm sorry. I'm just really trying to understand the gradations here. I appreciate the side-by-side comparison as between FUP and the other acronym, which I'm EAD or whatever it is. Okay. But then someone who in the Blanco Lara situation can't even come up close to where the Guevara or Cobian type of petitioner is. And yet in that group of people, they can accumulate the time. So all the arguments you're making about the reason for the seven years and what is totally distorted when you look at somebody in their category as compared with the petitioners here. And that's what I still continue to wrestle with. And so when I'm trying to make a distinction between family unity program and the non-family unity but do have the benefits of being able to get advanced parole, it's not automatic and it doesn't have the language about they'll return to the same admission status or whatever. But nonetheless, they are comparable because they can get it. It is a benefit. It's a benefit conferred because they have made this application for adjustment of status. I would answer your question by saying just because they have the opportunity to get the travel document, which I think that's not the focus here, it's that what do they return with or what status? It's not a status, but what sort of label do they return with? You're dodging the term status, and I understand why you're dodging it. Their status is distinguishable from other types of people who are here unlawfully. Somebody may have been admitted lawfully but is clearly and for a long period of time in the United States unlawfully and if caught would be given an NTA and sent away. These people have gone through a process and have been given benefits to regularize their residency here, become LPRs eventually. And the whole point of the seven years is to, and I was thinking back to the ten-year regime, which was it was there to establish that these people had real roots in the community. And yet the person doesn't get credit for it because of what turns on how we read admitted in any status, any status. And, you know, any status is what we're wrestling with here, not defined. But I believe keeping with the court's decision in Garcia-Quintero, they really went through a side-by-side analysis to sort of understand why it was different, why it conferred a sort of status. I don't think here just because you couple a work authorization, which in fact is given to aliens who already have a removal order against them. I mean, I believe the court wouldn't give them a status, would they? Well, but Quintero, that's why I'm getting my, it says in Quintero, it says Blanca's Laura weighs heavily in Garcia-Quintero's favor. They would make that our panel made that very comparison that I'm making. Right, but here the status isn't conferred until the application is approved. That's your argument. Do you agree with your colleague that admission into the Family Unity Program is admission into a status so that the Quintero interpretation of the statute is at least permissible, even though it overruled the- I agree with my colleague. I see in the court's reasoning that as they, you know, as they've cited to the board decisions where the board has in different circumstances extended the definition of admitted, it applied here to confer a status as they were allowed to say. Okay, and if somebody is admitted in the status as the status of a student, is that a lawful admission for purposes of this statute? Yes. So that's admitted in a status. They overstay, which we, you know, every time there's a turmoil in the world, all the students overstay, and we, and then they're, and so that would be that time after their expiration of their student status if they're here long enough would count? Right. Right. Those were the points I was going to cover. I mean, there was not much else I had to add to my colleague's argument. No further questions. Thank you. You know, I have to say that the Ochoa Colchado case that counsel cited, I don't think that's terribly instructive for the reason that it's a criminal case. It doesn't really, I mean, the language from that case is as counsel states, but it didn't really, it's not really a case that construes this cancellation of removal statute. I don't think it's terribly instructive. To go back to. But our problem is to try to give meaning to the statute, you know, to try to apply the statute. Right. And our clients were in the United States with status at the time that the government realized they were here, issues them a work permit, they can travel outside the country. To go back, Judge Fisher, I think, made a good point. The people that are here as non-immigrants, if they were to go in and apply for advanced parole to leave the United States, they couldn't get it. They would get picked up and issued an NTA, as counsel stated. They have less of a status in the United States than the adjustment of status applicant. You know, and there's plenty of examples. To go back to Judge Smith. But then we're back to the, you have to be admitted in the status. Right. I am. Well, you're admitted when the government receives your application. They review it, and they see that you have a prima facie case of eligibility, and based on that, they issue a work permit. So the review of the application is admission in the status. I would argue that it is. Yes, Your Honor. Review of that application. If the application is prima facie approvable, a work permit can be issued to the person. And de facto, it acts as a stay of removal because I've been practicing immigration law for 20 years, and barring the person going out and committing a crime or something, I've never seen a case where a person is waiting for their adjustment of status interview, they have a work permit, and the government decides, well, we're just going to pick up this person and issue them an NTA and put them in proceedings. Your client then had a little, developed a problem because of the smuggling? Is that what happened? Yes. And it was only, it was his daughter, and the only, he was, he wasn't eligible to apply for the waiver, the family unity waiver, that's within the smuggling problems because the daughter also had a baby. My client's grandchild with her, and because, for that reason, since the grandchild's not mentioned in the statute, he couldn't qualify for the special exemption. And Judge Smith, I don't know if you're still interested in this, but I heard earlier a question about the V visa. I am. Yeah, and I looked it up in a book I have with me, and it's a visa for a person who had an I-130 filed on their behalf, and it's been, before the year 2000, it came in the law in 2000, signed by President Clinton. If an I-130's pending for over three years for a spouse or a minor child, the spouse or minor child who's the immigrant, the beneficiary, can apply for a V visa, which gives a person a temporary status to be in the United States, work, travel back and forth. Clearly, that would be a status. That would clearly be a status, right? Sure. Yes, sir. And it would seem to me that then, given that there is a V immigration permit, or if you will, and that there is a status granted by that, it seems to cut across the idea that simply because one has an I-130 permit or one has all of these kind of situations, or even somebody in your client's situation, would then have a status. Well, I don't think so, Your Honor, because there's all different kinds of statuses that a person can have before they become a permanent resident. Then the statute says admitted in any status, and I think that what we're arguing is the adjustment of status application. When it's pending, that is a status, because the statute says any status. And so you're saying the filing of the I-130 is the admission in any status? Well, the 485, which is the adjustment. Yes, Your Honor. You're not arguing for the filing of the one, or even getting the I-130 is a status. That's not your case. That's not my case. But you wouldn't. No. Is it materially distinguishable? I don't know. I don't want to say anything that's going to hurt the other cases. Okay. Fair enough. Okay. Have your time. Thank you. All right. Thank you. Case to target is submitted for decision. You know, we often get asked about oral argument, whether oral argument helps the court, and I want to compliment all counsel on these three cases. It's been well-argued by you all, and the argument has been very helpful. So thank you all. And I join Judge Fisher. I think we've had very good arguments by counsel. Thank you very much. It was nice to have the time to do it, too. Appreciate it. The next we'll change gear totally now. And here the next case, which is Ford v. Hartford Life and Accident Insurance Company.
judges: Schroeder, Fisher, Smith N. R.